Good morning, Your Honor. Good morning, Mr. Lanahan. How are you? I'm good, Your Honor. Thank you very much. May it please the Court, Cook County trusted the relator to supervise the bookkeeping of its public health grant portfolio for a long time before she became suspicious of fraud in 2009. Noreen Lanahan appeared in the district court with proof that the defendant claimed wages and benefits as expenses to the pandemic flu in 2009, and she came with official county statements documenting federal payments of $2.5 million in personnel costs to the two H1N1 grants. Symmetry between these business records and Mrs. Lanahan's reputation as the Director of Financial Control with the proffer expected of a key TAM accountant in the United States on the information of, on the relation of Lesbi and Rolls-Royce is remarkable on page 854. The rules 9B and 12B6 should have been satisfied by this information according to the opinion in that case. Mr. Lanahan, I'm sorry. Go ahead, Judge Romer. Go ahead, you. I mean, go ahead, Sammy. Judge Sammy. The, so it sounds like you don't dispute that rule 9B applies here, correct? Absolutely. 9B applies. I'm not, I don't think that the existing standards need to be relaxed in any way to accommodate Mrs. Lanahan. Okay. So your first two claims are claims for false claim and the precise false statement at issue as rule 9B requires you to plead them. So let me take count one, which is a false claims. What is the claim there? Because your paragraph 77 just talks about Cook County presented false or fraudulent claims for payment. It doesn't say what the claim was, when it was filed, who filed it, et cetera. Your Honor, if I can turn the court's attention to exhibits one and two, those attached to the amended complaint, those were the wages and benefits that were charged to the United States for the H1N1 grant. But what's the specific statement? There has to be a particular claim for count one and a particular statement for count two. In your complaint, what's the particular statement or particular claim at issue? That the County incurred $1.2 million in wage and benefit costs related to both of these, the two H1N1 grants. But incurring it doesn't satisfy submitting a false claim. Incurring it might be part of the overall claim, but you still have to identify a claim submitted in connection with getting those funds. And I don't see that in your complaint. It has to be pled pursuant to 9B. So a date, et cetera. A date was supplied for September of 2011. The claims were presented and they were paid at the end of September of, I think, September. It's in the complaint. One moment, Your Honor. Paragraph nine. Paragraph, that's correct, Your Honor. On September 2011, the claims were certified, the grant allocation reports to the Centers for Disease Control. So that's what you're relying on, the September 1, 2011 electronic submission of the grant reports? Yes, Your Honor. For the two, for the presentment claims, Your Honor. Can I follow up on that a little bit, Mr. Lanihan? Yes, sir. I understand your theory basically to be that these reports were kind of dry-lapped, that they weren't based on actual reports. I don't see a claim that they're actually inaccurate. But I do see that the same employees between the two reports are slated to have devoted 75% of their time to each of the two grants. I'm glad that you asked that. Which would seem to be a problem. I'm glad that you asked that. And it is a problem. But I have alleged that both claims were false and that the accounting incurred no expense. And I gave three bookkeeping justifications because that was Mrs. Lanihan's perspective on it. But to your point that it appears that the two claims are double billing the county. And I agree that that's the case and that some employees could not have worked. But that, to call it double billing, like omits the fact that these employees were already being paid on county time. So you view that the county's paying for it and then the United States paying on top of it one time and paying on top of it another time. Well, wait a second, wait a second. I don't understand that claim. I thought these people are on the county payroll, the county is paying their salaries. And then the idea is that if they're spending time on the federal grants, the county gets reimbursed for that, right? The idea is that if you're claiming that you're expanding your payroll, these wages, the wages that were claimed in Exhibits 1 and 2 were never paid to those employees. And before 2009, that money, when the reimbursements came in, it would be credited to the public health department's personnel budget. These people were on the county payroll, correct? That's correct. So they were paid. They were paid by the county and then they did federal work on county time. Right. And the county did not reimburse itself for the federal service. It sent the money to the hospital system. Instead, before the hospital system was established, the money was credited to the county. But the wages, the wages as they were expressed in the two claims... Okay, as a fraud, that kind of internal accounting matter between the county and the hospital is frankly kind of a mystery. But could I direct your attention to your conversion claim with the WIC surplus funds, please? Yes, Your Honor. Um, the... I understood this to be, in essence, a pretty simple claim that the, uh, the county decided we've got 6.8 million accumulated surplus in WIC funds and we are going to make the heroic presumption that we must have incurred costs to offset those so we're going to keep it. Is that a fair summary of your position? That's a fair... That's an absolutely fair summary. Now, how... I know I'm looking a little bit beyond the pleadings and 9b doesn't require you to plead state of mind with particularity, but how do you wind up proving fraudulent scienter with respect to that WIC transfer? Nobody's... I mean, you don't, you don't, you don't see county officials getting rich from this. Well, Your Honor, the scanner that I recognized or I thought I was recognizing, the auditors informed, based on the context of the email, auditors alerted the county officials that no expenses related to these, no personnel expenses related to the money could be traced as costs in the county's books. So the county knew that it had no right to the government's that point. There was a debate ensued between these. These were high county officials, Your Honor. It was the budget director, it was the chief financial officer, and it was the health and hospital systems chief. And between the three of them, they just, they just concluded that the money should be applied as profit to the hospital system. Could I ask you about the HECTOAN fees? Yes, Your Honor. Were those disclosed in any way in grant applications or grant budgets? No. Oh, did the HECTOAN's administrative fee or what they were collecting for the county? I'm sorry? Well, I thought you were saying that... I will tell you that the HECTOAN claim is very confusing to me because I don't see what role Cook County, what responsibility it had under the False Claims Act with respect to these grants going to county doctors. Well, the county doctors relied on essentially Cook County's reputation to secure the grants. I understand that point. They claimed the county costs, including their own personnel costs to the grants, and then that money was deposited in HECTOAN's salary reallocation account in the dean's fund. And that was the, those funds, I mean, that money, those wages were never paid to anybody. Those funds were used as discretionary accounts for people like Dr. Hoda, and I don't mean to villainize him at all. I thought you sure did. I have the same problem with that because I'm trying to figure out, um, I mean, you allege that HECTOAN allowed the physicians to skim grant funds by submitting those reimbursement requests for unauthorized expenditures. But what was exactly the county's wrongdoing? How did, yeah, all right, well, I do have another, how did any action on the county's part constitute any sort of actionable false statement? Your Honor, the county became aware of these salary reallocation accounts and the dangers associated with them. Because of the Dr. Hoda issue, they took no action. I mean, during the period before and after. How is that a false claim though, if you find out about it and take no action? Maybe there's a regulatory violation, but how is that a false claim? Well, under the Reverse False Claims Act, if they had knowledge that there were funds, that there were government funds, and they didn't take action to disclose it, they disguised it, it's a violation of 36-37-29-A-1-T. Okay, I think... Don't, doesn't that apply though to your own, the defendant's own obligations to pay or transmit money to the government? They were the county's obligations. They weren't HECTOAN. HECTOAN was a third-party fiscal agent. These were county agents. They were claiming county costs. It was all county money, and the county knew that this was happening, at least when the investigation of Dr. Hoda began. So these funds, these discretionary accounts, the county knew about them and did nothing to repair it or anything. Could I, with the indulgence of my colleagues, there's a lot of moving parts in this case. There's the Public Health Institute set of allegations. And was the Public Health Institute of Metropolitan Chicago legally prohibited from acting as a fiscal agent for the city health department on these ARRA grants? Absolutely, Your Honor. Why? The grant called for the money to only be given to a certified public health department. The Cook County Department of Public Health was certified by state law to manage the money. It had the internal accounting resources. It had the credit, essentially. The Public Health Institute of Metropolitan Chicago was an obscure non-profit. It didn't have the financial controls to manage a $16 million grant. The money came in to the county. I mean, it never hit the county's books, but it was destined for the county as cash up front. And when the money got to Hectone, not even the auditors could find it. I'm confused. What does Hectone have to do with public health? I apologize, Your Honor. I meant the Public Health Institute of Metropolitan Chicago. Well, was the county prohibited from agreeing with the Public Health Institute of Chicago to administer this? Yeah, if there was no contract with the Public Health Institute of Metropolitan Chicago, only the Cook County Board of Commissioners could move public money around. Okay. And let me go back then for this count to ask Judge St. Eve's earlier question. What was the false statement made by the county to the federal government? I don't have an answer to that because the- That's a problem. Okay. Thank you. We've asked you a lot of questions and I appreciate the time. Thank you, Your Honor. And we will give you your response, okay? Because we did ask a lot. Thank you, Your Honor. Ms. Ferry, thank you. Thank you, Your Honor. May it please the court. I share your confusion about many of the claims that are in this- Well, let me see if I can straighten out some of it. Could you explain? Maybe you can straighten it out. Can you explain to us these Exhibits 1 and 2 with respect to the H1N1 grants and in particular how the county could attribute 75% of a number of employees' time to both of the two? Grants? So as I read those spreadsheets, whatever they are, and that's part of my argument as well, but if you look at both of the bottom line totals on the last page of Exhibit 1 and Exhibit 2, it gives a total amount of salary costs and the number is the same on each Exhibit 1 and 2. A little further down below that, maybe the second line from the bottom, I'm sorry, I'm doing this from memory, it apportions a percentage of the total to each of the two different grants. So as I read these spreadsheets, the first four pages account for all the time that would be expended by these employees. So 75% of their time in general for both of these grants and then each one is apportioned by 50% and then the other is apportioned at less than 50% of the total labor costs. Okay, can I ask you about the WIC? Could I, if I could on that, let me make sure, okay. I mean, if the county had not documented the actual time that the employees spent on these vaccine-related activities and it was just relying, if it was just relying on it, those prior estimates, why couldn't we infer from the county's knowledge that it was making a certification based on nothing other than its estimates rather than any reliable documentation of actual time? Well, for a couple of reasons. First, I would say because these, I wanna start by addressing what exactly these documents are and it's not clear to me either what they are or what role they play in making a claim, a false claim to the federal government to induce payment, which is what the plaintiff ultimately needs to plead and prove. So these documents, it's not even clear to me that they were submitted to the CDC in support of a claim for payment. It's not clear to me whether they were just internal documents who prepared them. If they were submitted, when were they submitted? Nothing on these documents suggests that there is any kind of certification of the hours or the costs listed there related to those payments. And there's nothing to connect either one of those reports to any money that was received from the federal government. I would also say- What about the allegation on page 10 of the complaint, paragraph nine, on or about September 1, 2011, Cook County electronically certified two grant allocation expense reports to the Centers for Disease Control, totaling $2.5 million in support of the PHER grants. The cost reports were generated under related supervision by a Department of Public Health employee, exhibits one and two. It sounds like she's saying that, I mean, this isn't a complaint, but this is the backup for the certification for incurring the cost. Well, I would say that exhibits one and two don't necessarily support any of the allegations. This is a 12B6 standard, right? Sure. Okay. Understood. And I understand your point, Your Honor, that it is a pleading issue, but with the heightened particularity that's required under the FCA and rule 9B, if the plaintiff is going to put forth some exhibits and support for the allegations, they should at least match up. And I don't even, there's no relationship between the exhibits three and four and either exhibits one and two, which the relator is claiming it evidenced the payment from the federal government. Well, yeah, I share your confusion about where in three and four fit into that, but that's... And additionally, part of this pleading requirement, this heightened pleading requirement, is that the relator must allege on an individualized transaction basis where the fraud occurred. Now here, there are two spreadsheets line by line listing all of these hours that the relator claims are false, but she alleges no basis for her statement that they are false. In fact, she does not track time. That's not part of her job. She didn't discuss this with any of the Department of Public Health supervisors. There's no independent knowledge here of the falsity of what allegedly was submitted. And in fact, the relator herself is listed on line 73 of those documents. And she claims that several of her subordinates are also on there. And she hasn't made a single allegation that either her time or any of her subordinates' time is false with respect to what she claims was submitted in support of a claim for payment. To the extent that the relator is now suggesting that the county never paid these employees and somehow pocketed the money, this is an allegation or an argument that appears for the first time in the reply brief. And so this is, so the relator has forfeited the argument there. It's also entirely unsubstantiated that I think we spoke about this earlier during the relator's presentation, but it's entirely unsubstantiated how it is that the payments under the county government's budget and the federal government's budget, these are not allegations. These are arguments and they're not supported. Now, the remaining three alleged schemes I hope that in all of this confusion, I can simplify these things for you. In the remaining three schemes involving the $6.8 million transfer, Hectoan and PHIMC, all of those claims involve the treatment of funds after they had been received from the federal government. As we know from Gross versus AIDS Research Center case, any claim under the False Claim Act has to amount to an inducement for the federal government to make a payment based on these false statements. Could you address the WIC claim under the terms of subsection or let's see, paragraph G? The conversion claim? Yes. Sure. So the relator suggests that these, that there were surpluses in four different grant-related accounts that had accrued over a number of years. In her email chain that's submitted as Exhibit 5 that she points to to support this claim, she acknowledges that surpluses do indeed exist. She acknowledges that they are intended to cover cost overruns per salary and fringe benefits if the grants are ever discontinued. She says that she was told by the auditor that the amounts there, not claiming that they're improper in any way or that they aren't properly in the custody of the county government, but the auditors reported that those funds can't remain in those particular account ledgers because there isn't an expense to charge against it. I'm not an accountant, I don't pretend to be, but it's a matter of where the funds sit. And so Ms. Lanahan's suggestion to her colleagues was we should put this money in a unique fund. After some discussion among her colleagues, which by the way, in the lengthy email included by the grant management director, she follows Ms. Lanahan's instruction virtually to the letter. The only place that they differ is whether to create a new unique account or as the grant management director discovered, there were vacation hours that had been paid out of this health enterprise fund in the past. And the money then that could have appropriately been paid out of the grant funds had been paid out of this other fund and so by transferring this money back into the health enterprise fund, it was reimbursing a different fund for payments that could have been made earlier under the grant. So aside from the fact that the relator does not anywhere in that message include a demand that this money be returned to the federal government or claim that it was improperly in the county government's possession. In fact, she agreed very much that this was money that could and should be used by the county. And the only difference is where it should be used. Which- I have a little trouble taking all of that on the pleadings. You wanna say, okay, Ms. Lanahan was a part of whatever it is that she's now claiming was conversion, amounted to conversion. But I understood these allegations to be saying that whatever explanations might be given or offered that this was money owed to the federal government and the county decided to keep it. Why, how can I reject that reading on the pleadings? Well, because exhibit five attached to the complaint contradicts that claim. Ms. Lanahan does not suggest that the money was improperly in the county's possession. She doesn't claim it. So the written attachment- The county possessed it originally. But I understand the theory to be that after the grants are closed, the grants are finished, you gotta repay the leftover to the federal government. Right? Well, that's not at all clear from the complaint because there's no discussion about what a closeout procedure should be or whether it had to be returned. Is that required to plead conversion under the False Claims Act? Yes, because the plaintiff or the relator in this case has to plead and ultimately prove that the money was wrongfully in the possession of the county. Yeah, okay. I'm not suggesting how this money should have, why it was improperly within the county's possession. It was surplus. It was permitted to be used specifically after the close if these grants were not renewed. How do we know that? Because that is in exhibit five and it's also pled in the complaint. Well, I can't check you on that. I know, I'm trying to look here, but I don't have a screen. May I look, submit to the court in the supplemental filing where the source for that comes from? Of course, and then we will allow Mr. Lanihan to respond in order we'll allow after our hearings. I am out of time. If your honors have additional questions, I'm happy to answer them or I thank you for your attention. Well, we thank you. And I think maybe five minutes for you, Mr. Lanihan, because we really did go over. Thank you, your honor. I think that the exhibit three, there was some confusion expressed about exhibit three. Exhibit three were the two vouchers that reflected the county's receipt of the payment for the two claims, for the personnel costs that were claimed. So on page, it's 58-3, page two and three, it shows that the county received reimbursement to department 895 Cook County Department of Public Health for services, travel and medical supplies incurred on behalf of the pandemic flu program. And then the other one is the corresponding, I think they're called vouchers, but these are official county records that reflect its receipt of the federal payments for the H1N1 pandemic flu grants. Does that help? I'm sorry, Judge Hamilton, I know that you expressed some confusion. Yeah, I don't know exactly what they had for you, but maybe I was completely wrong in my interpretation of this, for example, the 75% of time, since all these times seem to be split between the two grants. But, okay. I don't wanna take further time from you. Well, understood. But the county has argued that she hasn't proven or pled the county got paid for the H1N1 grant work, but these documents, these official county documents map to the documents that were referred to as claims in exhibits one and two, and exhibit four is Mrs. Lanahan's official correspondence with the comptroller informing her that where this money is supposed to be credited to. And the day after it was credited to Cook County, it was moved to a discretionary account held by the hospital system. Is that a problem? It's a big problem, Your Honor. There was no green, because there's no arm's length transaction. These were, the funds that were awarded to Cook County were for suburban Cook County residents. The hospital system sees a population at large. Just the two systems do not- Or isn't that a completely just internal county transaction? If the county had already performed the services that were properly covered by the grant, federal government pays them, why isn't it just an internal matter for the county where it decides to send the cash that it had basically been fronting for the federal government for a couple of years? You're exactly right, but that's the mistake that the county never fronted the money up in the beginning. It was supposed to fund the grants up front, but the grant business units never incurred costs. They were never funded on the front end. The work didn't get done? I never said, Your Honor, that the work didn't get done, but the county had to set up these grant business units in accordance with their own internal procedures and the uniform administrative requirements, and they were never funded on the front end. But if they don't follow their own internal procedures, why is that a False Claims Act case? Your Honor, they were not following the government's prescribed procedures for grantees either. They had to set up these accounts. They have to be segregated. And the hospital system is an independently run organization. It bills the United States on certified cost reports for its own labor, and those costs are fixed. And to send this surplus money as cash, discretionary cash available to the hospital system, it's very bad. Have you in any way, what, identified any specific aspect of the certificates with which that, I guess you're calling it a reallocation, was inconsistent? And since if, okay, and to the extent that that reallocation occurred after the county submitted the certifications, why were they, where have you shown why those certifications were knowingly false at the time they were made? Your Honor, according to the cost principles, and I can supplement the section in response to the Applease supplement, the cost principles do not wear off until all obligated funds are paid. So the obligations, you can certify it. If you have what you're calling obligations, in this case, they were obligations to Cook County, the obligation to liquidate your, what the requirement to liquidate your obligations and send the money back to the United States, it endures until the obligations are satisfied. You can't claim money, hold onto it till after the certification comes and just move it to a third party to get it off your books and avoid detection by the auditors. Okay, but what is the specific, I just have to say it again, because to me, it looked like it was quite vague about the, you know, that the reallocation undermined the truth of your September 1, I guess, 2011 budget. Okay, well. The certification occurred the day before the county received the money. It was a routine thing. The certification was made and a wire transfer was paid. And the certification was essentially, it was promising that the funds were managed in accordance with the cost principles under sections 300.01 and what follows after that. And those principles say that once your obligations are met, after everything is said and done, any money you have left has to go back to the treasury. It can't be designated to another third party, no matter if it's charitable or for profit. The county couldn't take this public health money and donate it to a political action group. But when it goes to the hospital system as cash, the money can be used for anything. Oh, well, all right. I guess if I just say to Judge Hamilton, do you have anything you would like to ask or add? No, thank you, Judge Roper. All right. Well, my, everyone, thank you very much, I think. And we're going to take the case under advisement.